FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

00 JAN 20 AM 9: 45

U.S. DISTRICT COURT
N.D. OF ALABAMA

DEBORAH B. MONTGOMERY,       )
                            )
      Plaintiff,             )
                            )        Civil Action No.   **ENTERED**
v.                           )
                            )        98-AR-2100-S         **JAN 20 2000**
                            )
CITY OF BIRMINGHAM, et al.,  )
                            )
      Defendants.            )

## MEMORANDUM OPINION

Presently before the court is defendants' motion for summary judgment. Plaintiff, Deborah Montgomery ("Montgomery"), alleges that defendants, City of Birmingham ("the City")[1], Demetrius Newton ("Newton"), and William Pate ("Pate"), violated Title VII when they discriminated against her on the basis of her race and/or sex and when they retaliated against her for filing charges with the EEOC. Montgomery also claims that defendants violated 42 U.S.C. § 1981, § 1983, and § 1985(3) by discriminating against her on the basis of race.  Montgomery next alleges that defendants violated her procedural and substantive due process rights protected by § 1983. Finally, Montgomery alleges that defendants committed the tort of

_____

[1] The court notes at the outset that although the memorandum opinion refers repeatedly to "the Law Department," the City of Birmingham remains the proper defendant.  The Law Department is merely the particular City department acting in this case.



outrage.    Defendants seek summary judgment as to all counts of
plaintiff's complaint.   For the reasons set forth in the opinion
below, defendants' motion is due to be granted.

## Pertinent and Undisputed Facts

The Law Department of the City of Birmingham consists of the
City Attorney, the Chief Assistant Attorney, assistant city
attorneys (classified as either Principal Attorneys, Senior
Attorneys, or Attorneys), legal assistants and secretaries.   The
Law Department has two general practice areas: municipal court
prosecutions and general law assignments.    Municipal court
prosecutors are assigned to a particular court which they cover
until they are reassigned to another court.   They may also fill in
for a prosecutor in another court.   On a daily basis they are
supervised by Charles Wyatt, a Principal Attorney.

Montgomery is an African-American who was employed by the Law
Department as an attorney.   She was hired as a Senior Attorney in
1992.   She was assigned to Municipal Court as a prosecutor.   During
most of her employment with the Law Department, she prosecuted in
traffic court.    However, at times she performed general law
assignments, such as drafting ordinances.    Montgomery had
previously worked as an attorney for the Legal Aid Society, as a

2

Judge Advocate General for the United States Army, as a sole practitioner, and as an attorney for Legal Services of Metro Birmingham.

At all times relevant to this action, Newton was the City Attorney and Pate was the Chief Assistant City Attorney. Newton is African-American, and Pate is Caucasian.

In early February of 1996, Montgomery was working as the City Prosecutor in Judge Raymond Chambliss' Court. She was in charge of prosecuting defendant Henry Rice, Jr.[2] According to Montgomery, the case was continued until March 20, 1996. Regardless of whether the case was merely continued or whether it was actually set for trial on March 20, it is undisputed that on March 19, 1996, attorney Emory Anthony appeared as counsel for Rice and produced a business license. Subsequently, Montgomery recommended that the charge against Rice be dismissed.

At some point after the case against Rice was dismissed, Newton received a complaint from then Birmingham Police Chief, Johnnie Johnson, regarding the Rice case. Johnson memorialized his complaint in a three page memorandum dated March 28, 1996. The

---

[2] It is apparently in dispute whether Rice was being prosecuted for operating without a business license or for failure to keep his property clear of inoperable vehicles or both. However, this is not a material fact for summary judgment purposes.

Chief's memo indicated that he was upset because Rice had been cited by the police on numerous occasions for failure to comply with various ordinances dealing with junk yards. Chief Johnson stated that the case which Montgomery recommended be dismissed had nothing to do with whether Rice had a business license because the charge was for failure to keep his property clear of inoperable vehicles. Chief Johnson's memo also indicated that he was upset because Montgomery did not consult the police department before dismissing the charge.

Pate informed Montgomery of the complaint and directed her to consult with him, pending investigation of the matter, prior to dismissing any more cases involving Anthony and Rice. (Memo from Pate to Montgomery of 4/9/96 at 1.) Pate then provided Montgomery with a copy of Chief Johnson's memo and asked her to respond to it in writing. Montgomery responded to Pate's request via memorandum dated April 18, 1996. In her memo, she stated that at the time she dismissed the case against Rice, she was not aware of any earlier arrests or charges against Rice other than the pending business license charge. She further stated that the Rice file with which she had been working did not contain some of the information about which the police had apparently been aware. Montgomery explained that, according to her interpretation of the ordinance that Rice

4

was charged with violating, the production of a valid business license would warrant dismissal. (Memo from Montgomery to Newton of 4/18/96 at 3.)

On or about April 23, 1996, Montgomery received a memo from Pate regarding transfers of assignments. That memo stated that Michael Fliegel had been reassigned to the 6th floor and had been given responsibility for "general assignments in the general law section" and for circuit court appeals. On May 7, 1996, Montgomery filed with the EEOC a charge of employment discrimination based on her race and sex. She alleged that she had been subjected to adverse terms and conditions of employment in that she was instructed to handle cases contrary to standard operating procedure and contrary to the manner in which white, male prosecutors were required to handle similar cases. Montgomery also claimed that the Law Department discriminated against her when it reassigned Michael Fliegel to the 6th floor.

On or about June 6, 1996, during a Law Department monthly meeting, Pate announced that Mayor Arrington had requested that all departments create a work agenda. All of the lawyers in the Law Department, except Thomas Bentley (a black male) and Montgomery, were given assignments. On July 15, 1996, Montgomery filed an amended charge of discrimination with the EEOC claiming retaliation

5

with regard to Fliegel's reassignment to the 6th floor.

On or about August 7, 1996, Montgomery went to work but told the secretary that she was ill.    Montgomery then asked the secretary to get someone to cover her court.   Sometime later that day, Pate came into Montgomery's office to find out what was wrong. Montgomery told him that she was ill and wanted to take sick leave. Pate told her that she could not take sick leave unless she provided him with a doctor's excuse.  Otherwise, he said, any leave would be charged to her vacation time.

On or about August 23, 1996, Newton told Montgomery that he wanted her to draft a "drug house" ordinance.   Newton told her that Pate would discuss with her the details of the assignment.   Pate never discussed the assignment with her.   After several weeks, Montgomery wrote a memo to Newton requesting further instructions on the assignment.   Two to three weeks after receiving Montgomery's memo, Newton informed her that he needed the ordinance in final draft form within a week.   Montgomery complained that this did not give her sufficient time to complete the assignment.

Before Thanksgiving of 1996, Montgomery requested to be off for the Wednesday before and the Monday after the Thanksgiving holiday.   Her request to be off for Wednesday was granted, but her request for Monday was denied.

6

On or about January 27, 1997, Montgomery was working as a substitute prosecutor in Judge David Barnes' court. Emory Anthony had a case scheduled for trial in that court. Due to the prior incident involving Anthony, Montgomery was apprehensive about handling the matter. As a result, she informed Judge Barnes that she could not handle a matter involving Anthony. Judge Barnes immediately contacted the Law Department to find out why Montgomery could not handle the case. After receiving Judge Barnes' call, Pate gave Montgomery a written directive which stated: "This letter is to advise that pending further discussion you are specifically authorized to prosecute cases involving Emory Anthony, Attorney, provided that you will always be expected to exercise prosecutorial judgment in regard to dismissing any case." (Memo from Pate to Montgomery of 1/27/97 at 1.)   Pate sent a copy of this memo to Judge Barnes as well. At some point after this, Pate placed this memo along with all other memos regarding the Rice/Anthony incident in Montgomery's personnel file.

On January 28, 1997, Montgomery amended her EEOC charge, claiming continued violations, harassment, hostile work environment, and retaliation. On February 18, 1998, Montgomery filed additional EEOC charges, alleging continuing discriminatory treatment.

## Summary Judgment Standard

Rule 56(c), F.R.Civ.P. provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The Supreme Court has emphasized that this language means exactly what it says: there must be a genuine issue of material fact, not merely some factual dispute.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510. What this standard means in practice is that "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S.Ct. at 2511 (citing First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575 (1968)).

On defendants' motion for summary judgment, the court must look at the evidence, construed in plaintiff's favor, to see if a jury could return a verdict for plaintiff.  If so, defendants' motion for summary judgment must be denied.  If, however, as a matter of law, a jury could not return a verdict for plaintiff, defendants' motion must be granted.

## Title VII Claims

The court first notes that to the extent that Montgomery asserts her Title VII claims against Newton and Pate individually, her claims are not actionable because Title VII applies only to employers, and these two defendants were not plaintiff's employer. See Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991).[3] Thus, the court's discussion of all of Montgomery's Title VII claims applies only to the City.

DISPARATE TREATMENT

Under McDonnell Douglas, Montgomery can establish a *prima facie* case of discrimination by showing: (1) she belongs to a protected group; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside the protected class more favorably; and (4) she was qualified to do the job. See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). The court will apply this test to each of Montgomery's individual complaints.

### The Rice/Anthony Incident

Montgomery claims that she suffered discrimination in various

---

[3] Apparently, some district courts question whether Busby is still the law of the Eleventh Circuit. However, this court would direct those in doubt to Smith v. Lomax, 45 F.3d 402, 403 n.4 (11th Cir. 1995).

9

forms regarding the Rice/Anthony incident.   First, she says that

she suffered adverse employment action when Pate instructed her in

his memo not to dismiss any cases involving Emory Anthony and Rice

without his consent.[4]   The essence of Montgomery's complaint

regarding Pate's directive is that she was being told how to handle

cases and that Pate's instruction was "contrary to standard

operating procedure and contrary to manner [sic] in which other

prosecutors are required to handle similar cases."   However, the

court does not see how these instructions from a superior attorney

can be an adverse employment action.   The memo from Pate states:

"Pending Mr. Newton's review of this matter and instructions

otherwise, you are not to dismiss any case brought against Mr.

Henry Rice without my consent and further you are not to dismiss

any case in which the defendant is represented by Mr. Emory Anthony

without my consent." (Memo from Pate to Montgomery of 4/9/96 at 1.)

Pate gave these instructions because he had received a memo from

---

[4] Montgomery also says that Newton instructed her not to dismiss any case involving Mr. Rice or any other case where Attorney Anthony was the attorney of record. On April 19, 1996, however, Newton sent Montgomery a memo which denied that he had knowledge of Anthony's involvement in Mr. Rice's case and which denied that he had given her the above instructions regarding her prosecution of cases. This factual dispute is not material to the summary judgment motion since it is undisputed that Pate, at least, gave Montgomery the directive regarding her prosecution of cases involving Rice and Anthony.

10

Chief Johnson which questioned why the Rice case was dismissed.[5]
Pate was not usurping Montgomery's prosecutorial authority in
general. He was merely instructing her, at least for the time
being, to get his consent before dismissing a case involving the
particular defendant and attorney involved in the matter.
Furthermore, Pate instructed Montgomery in the same memo to respond
in writing to Chief Johnson's memo. Thus, Pate was giving
Montgomery a chance to respond fully and to give her side of the
story. Given these circumstances, Pate's directive to Montgomery
did not constitute adverse employment action.

Montgomery further claims that she suffered adverse employment
action because she was reprimanded and embarrassed and because the
memos surrounding the incident were all placed in her personnel
file. There is no merit to Montgomery's contentions. First, she
was never reprimanded. There is no evidence that Montgomery was
disciplined or accused of inappropriate conduct by Pate and Newton.
As the undisputed facts indicate, Pate informed her that the Police
Chief was upset about her dismissal of the charge against Rice.

_____

[5] Montgomery's assertion that defendant cannot rely on the Police
Chief's memo because it is inadmissible hearsay shows a fundamental
misunderstanding of the hearsay concept. Defendant is not attempting to use
the memo to establish that the things Chief Johnson said were actually true.
Instead, the memo's function is to show Pate's state of mind with regard to
the alleged discriminatory action.

11

Pate then gave Montgomery a copy of the Police Chief's memo and told her to respond in writing.  There is nothing to indicate that Pate gave Montgomery even an oral reprimand.  Instead, Pate gave her an opportunity to tell her side of the story.  Next, the fact that Montgomery may have been "embarrassed" does not constitute adverse employment action.  An employee who claims to have suffered a "bruised ego" does not present evidence of an adverse employment action.  Smith v. Alabama Dept. of Pub. Safety, 64 F.Supp.2d 1215, 1222  (M.D. Ala. 1999) (citing Flaherty v. Gas Research Institute, 31 F.3d 451, 457 (7th Cir. 1994)).

Finally,  the  placing  of  documentation  regarding  the Rice/Anthony incident in Montgomery's personnel file was not an adverse employment action.  None of the documents can be construed to be formal written reprimand.  To the contrary, Newton's memo states: "I am not now or have ever [sic] accused you of any unethical or improper conduct regarding this or any other cases." (Memo from Newton to Montgomery of 4/19/96 at 1.)  There is simply nothing in the correspondence between Pate and Montgomery or Newton and Montgomery to indicate that she was being reprimanded for her behavior.  Furthermore, even if the memos could be construed to be, in effect, written counseling statements, there is no evidence that she  suffered  any  adverse  job  consequences  as  a  result  of  the

12

documentation in her file.[6] Thus, the documentation does not
constitute adverse employment action. <u>See</u> <u>Merriweather v. Alabama
Dept. of Pub. Safety</u>, 17 F.Supp.2d 1260, 1275 (M.D. Ala. 1998)
(holding that there was no adverse employment action where
plaintiff had produced no evidence that she has been fired,
demoted, or denied any pay increase because of written counseling).
<u>Cf.</u> <u>Fowler v. Sunrise Carpet Indus., Inc.</u>, 911 F.Supp. 1560, 1583
(N.D. Ga. 1996) (holding that a formal written reprimand which
threatened termination qualified as an adverse employment action
despite its later removal from the plaintiff's personnel file); <u>Kim
v. Nash Finch Co.</u>, 123 F.3d 1046, 1060 (8th Cir. 1997) (holding that
employer's "papering" the employee's personnel file with negative
reports, including written reprimands, constituted adverse
employment action); and <u>Schmidt v. Montgomery Kone, Inc.</u>, 69
F.Supp.2d 706, 714 (E.D. Pa. 1999) (holding that a formal letter of
reprimand which resulted in a notation in the employee's file which

_____

[6] Montgomery's brief makes the conclusory assertion that "Placing the
document in Montgomery's file was in essence a disciplinary action."
Montgomery then states that her performance appraisal in 1996 was lowered,
apparently implying that the document in her file caused a lowered appraisal.
The court addresses fully Montgomery's retaliation claim regarding her
allegedly lowered appraisal *infra*, but notes for now that even if the
appraisal was in fact a lowered or negative one, it did not result in any
adverse employment action. Thus, any lowered appraisal could not be an
adverse employment action that was caused by the documentation surrounding the
Rice incident.

led to termination constituted an adverse employment action).

### Reassignment of Fliegel to the 6th Floor

Montgomery contends that the Law Department's reassignment of Michael Fliegel to the 6th floor was discriminatory and retaliatory. First, the court notes that the reassignment could not have been retaliatory because Fliegel was reassigned in April of 1996 and Montgomery did not file her EEOC complaint until May of 1996. Thus, it is not logically possible for the filing of the EEOC charge to have caused the reassignment.

Montgomery also argues that Fliegel's reassignment was discriminatory. Although Montgomery has not articulated the elements of a failure to promote claim, this is apparently what she is attempting to argue. See Pl.'s Mem. of Law in Support of Pl.'s Response to Def.'s Motion for Summ. J., at 24. Montgomery goes on to say that she was qualified for the position but not assigned to it. While it is not the court's job to articulate Montgomery's particular cause of action for her, the court will nevertheless address the issue as a failure-to-promote claim.

To establish a *prima facie* case for a failure to promote, Montgomery must show that: (1) she is a member of a protected class; (2) she sought and was qualified for the position; (3) despite such qualifications, she was not promoted; and (4) that the

14

employer filled the position with a person outside her protected class.   See Walker v. Mortham, 158 F.3d 1177 (11th Cir. 1998) (holding that plaintiff is not required at the *prima facie* stage to show that the person who was selected for the promotion was equally or lesser qualified than plaintiff).

The central problem with proving a failure to promote claim under these circumstances is that there really was no "promotion." As the City points out, Fliegel had a conflict with the judge he was prosecuting in front of, so Pate decided to reassign Karen McLain from night court to that judge's court.   Pate then reassigned Larry Warren from the 6th floor to night court to take McLain's place, and Fliegel was reassigned to the 6th floor to take Warren's place.   Thus, given the circumstances, Fliegel's change in position was considered a "reassignment," and not a "promotion." As a result, there was no position for Montgomery to have "sought" since defendant was not attempting to "fill" an open position. Put another way, this is not a case in which someone retired from a senior position or in which a new position was created and Fliegel was selected for the position while Montgomery was not.   Therefore, Montgomery cannot establish a *prima facie* case under the failure to

15

promote rubric.[7]

Because Montgomery has not attempted to proceed on any
alternative theory such as failure to post, advertise, or interview
for the 6th floor position, the court cannot conceive of any other
way in which the reassignment could have been discriminatory.
Thus, Montgomery cannot establish a disparate treatment claim on
the basis of Fliegel's reassignment.

HARASSMENT, HOSTILE WORK ENVIRONMENT, AND RETALIATION

According to Montgomery's EEOC charge dated January 28, 1997,
the following specific claims are based on harassment, hostile work
environment, and retaliation: (1) Denial of sick leave; (2) A
lowered performance appraisal; (3) Denial of vacation leave; (4)
Montgomery allegedly not being given job assignments commensurate
with her classifications as a Senior Attorney; and (5) Pate's and
Newton's alleged refusal to assist Montgomery with her workload.
According to Montgomery's EEOC charge dated February 18, 1998, the

---

[7] Even assuming that Montgomery could establish a *prima facie* case for
failure to promote, defendant has articulated a legitimate, non-discriminatory
reason for Fliegel's reassignment. The Sixth Floor litigation assignments
involved federal court practice and complex litigation. As defendant points
out in its brief, Fliegel had practiced for eleven years during which he
gained federal court jury trial experience, experience in collections,
bankruptcy, criminal and civil litigation. Comparatively, defendant points
out, Montgomery had practiced for only five years and her prior legal
experience did not include jury trial or federal court experience. Thus, the
Law Department believed that Fliegel was qualified for the 6th floor
assignment.

City's action of not hiring her for the Principal Attorney position constituted harassment, hostile work environment, retaliation, and sex discrimination.

The court will address each of these actions as to whether it can amount to retaliation. However, the court finds that none of these actions constitutes sexual or racial harassment. By process of elimination, the court infers that Montgomery is proceeding on the hostile work environment theory, and not the *quid pro quo* theory. In order to establish a hostile work environment claim, Montgomery must establish that: (1) she belongs to a protected class; (2) she was subject to unwelcome harassment (such as sexual advances, requests for sexual favors, other conduct of a sexual nature and/or racial epithets or racially derogatory comments); (3) the harassment was based on race or sex; and (4) the harassment affected a term, condition, or privilege of employment. See Henson v. City of Dundee, 682 F.2d 897, 903-904 (11th Cir. 1982). Furthermore, Montgomery can succeed only if she can show that the harassing conduct was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive working environment. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405 (1986)(quoting Henson at 904).

Applying this standard, it is clear that Montgomery has

17

produced absolutely no evidence of any kind of harassing behavior based on her sex and/or her race. She admits that she never heard Pate use racial slurs or expletives (Depo. of Pl. at 112), and that she never heard Pate refer to women in a derogatory fashion (Depo. of Pl. at 113.) Montgomery further admits that she never heard anyone in the Law Department use a racial or gender-based slur. (Depo. of Pl. at 116.) In sum, Montgomery points to no harassing language or behavior which has sexual or racial connotations. Thus, there is no evidence, which, if believed by a jury, could establish a hostile work environment claim based on Montgomery's race or sex.

The court notes, however, that even if all of the Law Department's actions could somehow be construed to constitute a hostile work environment claim based on race or sex, the City would still win on summary judgment due to the affirmative defenses in Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275 (1998). First, there is no evidence that Montgomery attempted to avail herself of the City's harassment complaint mechanism. Therefore, she unreasonably failed to take advantage of any preventive or corrective measures offered by the City. Second, it was not possible for the City to promptly correct any alleged harassing behavior since Montgomery did not make anyone aware of

18

any alleged sexual or racial harassment. Thus, Montgomery's harassment/hostile work environment claims would still fail.

## RETALIATION

In order to establish a *prima facie* case of retaliation under Title VII, Montgomery must show: (1) that she engaged in protected expression; (2) that she suffered an adverse employment action; and (3) that there is a causal connection between the protected expression and the adverse action. See Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993). The court will address each of Montgomery's retaliation claims individually.

### Sick leave

On Wednesday, August 7, 1996, Montgomery came to work feeling sick. She telephoned the senior secretary about securing a replacement to cover her in court. When Pate questioned Montgomery about what was wrong, she told him that she wanted permission to use sick leave to take the rest of the day off as well as the next day (Thursday) and possibly the next day (Friday). Pate told her that in order to take those days off, she needed a doctor's excuse. Otherwise, she would have to use her vacation leave. Montgomery complains that Pate's requirement that she obtain a doctor's excuse was retaliatory. However, Montgomery cannot establish her *prima*

19

*facie* case because Pate's directive does not constitute an adverse employment action. Montgomery was not being forced to stay at work; she could have gone to the doctor and gotten a doctor's excuse or she could have used her vacation day(s).

Furthermore, even if this did constitute adverse action, the Law Department has two legitimate non-discriminatory reasons for Pate's instructions: (1) the Law Department's written policy clearly states that it can require certification to substantiate sick leave claims of less than 5 days; and (2) the Law Department's recent enforcement of the documentation policy due to problems with another employee's suspected abuse of the leave policy.

In response, Montgomery attempts to argue that another prosecutor was treated more favorably regarding sick leave. However, Montgomery has offered no evidence other than her own conjecture that the comparator, McLain, ever requested advanced approval to use her sick leave without presenting a medical excuse. In addition, McLain declared that she never asked for advance approval for sick leave except where she was scheduled for surgery or had a physician's appointment. (McLain Decl. ¶ 5.)    Thus, Montgomery cannot rely on McLain to establish retaliatory intent. As a result, Montgomery's retaliation claim as it relates to sick leave must fail.

### Performance Evaluations

Montgomery appears to allege that the Law Department retaliated against her by giving her a lowered performance evaluation in November of 1996. The only statement Montgomery makes regarding the alleged lowered performance evaluation is the following: "On or about November 5, 1996, Montgomery received a lowered appraisal. The appraisal was lower than any previous evaluation she had ever received." (Pl.'s Mem. of Law in Support of Pl.'s Response to Def.'s Motion for Summ. J. at 12.) Apparently, Montgomery claims that this evaluation was in retaliation for the charges she filed in May of 1996 and the amended charge filed on July 15, 1996.

First, this court does not agree that the performance evaluation in question was negative. One of the most recent cases to discuss the issue of performance evaluations is Merriweather v. Alabama Dept. of Pub. Safety, 17 F.Supp.2d 1260 (M.D. Ala. 1998). The facts of Merriweather are similar to the facts here. In Merriweather, the court found it questionable whether plaintiff's performance evaluations were actually negative. Much like this case, the employer had recently changed its evaluation forms and categories. Although the employee's score was lower than the previous year, she still rated as "meets expectations." Therefore,

the court held that there was no adverse employment action. Merriweather at 1274. See also Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997) (holding that although plaintiff's performance evaluation was lower than the previous year, it was not a "negative" one because the score was based on new and expanded evaluation categories and still merited a "meets expectations" rating).

Likewise, here, the court cannot see how Montgomery's evaluation in 1996 could be characterized as negative. The Law Department started using new evaluation forms in 1995.  The new form measured performance on specified job tasks instead of rating general characteristics such as personality, aptitude, initiative, reliability, knowledge, and quality of work.  The old evaluations were on a scale of zero to 100 while the new evaluations used the following designations: below expectations; needs improvement; meets expectations; commendable; and exceeds expectations.  Thus, any scores on the old form really cannot be used for comparison purposes.  However, because the Law Department began using the new form in 1995, the court can compare Montgomery's 1995 score with the one she received in 1996.

In December of 1995, Montgomery received a "meets expectations" rating in 6 of the 8 categories and a "commendable"

rating in the remaining 2.  In November of 1996, the evaluation that Montgomery complains of, she received a "meets expectations" rating in every category.  Thus, Montgomery did not receive a "needs improvement" or a "below expectations" rating in any category.  Although she did not receive a "commendable" rating in any category, the evaluation was still a positive one and did not vary too much from the year before.  In other words, this is not a case in which Montgomery had always or previously received an "exceeds expectations" or a "commendable" rating in several or most categories and then received only "meets expectations" in 1996.

However, even assuming that the 1996 evaluation could be viewed as negative, Montgomery fails to establish a *prima facie* case of retaliation because she cannot show that the evaluation resulted in any adverse employment action.  Other courts agree. See Merriweather, 17 F.Supp.2d at 1275 (holding that plaintiff failed to establish a *prima facie* case of retaliation where she neither alleged nor showed that a negative performance evaluation was used or could have been used in the future as the basis for any adverse employment action); Montondon, 116 F.3d at 359 (holding that there is no adverse employment action where the evaluation was never used as the basis for any action against the plaintiff); and

23

Booker v. Budget Rent-A-Car Systems, 17 F.Supp.2d 735, 751 (M.D. Tenn. 1998) (holding that plaintiff failed to prove his *prima facie* case where a negative performance evaluation was not used as a factor in lowering his pay, decreasing his benefits, or otherwise adversely affecting his job status). See also Smart v. Ball State Univ., 89 F.3d 437, 442 (7th Cir. 1996) (noting that "There is little support for the argument that negative performance evaluations alone can constitute an adverse employment action."). This court agrees in principle with the courts above and holds that where a plaintiff does not offer any evidence that negative performance evaluations led to adverse employment actions, that plaintiff has not established a *prima facie* case of retaliation.

Applying this standard to these facts, Montgomery cannot establish her *prima facie* case. She was not fired or demoted, and her pay was not affected. In sum, Montgomery has produced no evidence from which a reasonable jury could infer that she suffered an adverse employment action as a result of the 1996 performance evaluation. Thus, her retaliation claim based on the performance evaluation fails.

### Denial of vacation leave

Montgomery apparently alleges that the City retaliated against

her by denying her request for vacation time. She requested that
she be off the Wednesday before and the Monday after the
Thanksgiving holiday. The Law Department denied her request as to
Monday. The court thinks it unlikely that a denial of one day of
vacation leave is an adverse employment action. Vacation time is
usually discretionary with the employer. However, even if the
denial of one day of vacation leave were an adverse employment
action, the court finds it hard to see any discriminatory animus
since, after the Department became aware that Montgomery had filed
an EEOC charge, this was the only day out of thirteen that the Law
Department denied Montgomery's vacation request. Also,
Montgomery's supervisor explained that he did not have anyone to
cover her courtroom for the Monday following Thanksgiving. Because
Montgomery has produced no evidence of discriminatory animus in the
face of the City's legitimate, non-discriminatory reasons, her
retaliation claim as to the denial of one day of vacation leave
fails.

### Job assignments

Montgomery alleges in her January 28, 1997, EEOC charge that
she was "not given job assignments which [we]re commensurate with
her job classifications" as a Senior Attorney. However, the only
specific complaint regarding job assignments that the court can

25

find in Montgomery's pleadings and brief is the Law Department's failure to give her an assignment at a meeting on June 10, 1996. Because this court is not a mind reader, it will not attempt to guess or speculate about what other possible actions Montgomery might be complaining of.   As the Eleventh Circuit has wisely pointed out, "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. . . . Rather the onus is upon the parties to formulate arguments; . . ." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)(citations omitted).   Because Montgomery has not pointed to any other specific instances in which the Law Department allegedly did not give her appropriate assignments, the court will address only the June 10, 1996, meeting.

The first time that Montgomery complained about her superiors' behavior with regard to her job assignment was in her EEOC charge dated January 28, 1997.   Since the June 10, 1996, meeting occurred more than 180 days before plaintiff filed the January 29, 1997, EEOC charge, her retaliation claim as to this meeting is time-barred.   Thus, Montgomery's retaliation claim with regard to her

work assignments must fail.[8]

### Workload assistance

Montgomery contends that the Law Department retaliated against her by refusing to provide her with assistance in the traffic court which carried with it the heaviest case load. The City argues that Montgomery's claim is time-barred because her problems with her workload existed long before she reported them to the EEOC in her charge dated January 28, 1997.   In order for her workload assistance claim to be retaliatory and not time-barred, Montgomery would had to have suffered retaliation after May 6, 1996, but no more than 180 days before January 28, 1997.   Montgomery does not specify any particular date or time that she asked for workload assistance and her request was denied.   Montgomery merely states: "Montgomery handled one of the larger court dockets.    On an average, her court prosecuted 4,000 to 6,000 cases each month, while other Birmingham Municipal prosecutors [sic] courts may process as few as 300 cases per month.  During a monthly meeting, Mr. Newton indicated that prosecutors with larger dockets would receive assistance from prosecutors with lighter dockets.  Despite

---

[8] The court notes that although Montgomery amended her original EEOC complaint in July of 1996, one month after the June 10th meeting, that amended complaint merely added retaliation as one of the theories with regard to Michael Fliegel's reassignment to the 6th floor.  That amended charge did not mention any complaint of retaliation with regard to the June 10th meeting.

Montgomery's repeated requests for assistance, such assistance was little to none." During Montgomery's deposition, defendant asked her whom she had asked for workload assistance prior to January 28, 1997. (Depo. of Pl. at 70.) Montgomery replied that she asked Newton and Pate at some point but stated that she could not remember the date or time. Id.

The court must give Montgomery the benefit of the doubt for summary judgment purposes and will assume that she made requests for assistance within the 180 days before she filed the January 28, 1997, EEOC charge. Thus, assuming that Montgomery can establish a *prima facie* case of retaliation as it relates to workload assistance, the City responds that it did provide Montgomery with assistance. Montgomery admits that for a short period of time, Michael Fliegel assisted her. (Depo. of Pl. at 69.) Pate also declared that he instructed other prosecutors, including Karen McLain, to assist Montgomery when their schedules permitted. (Pate Decl. ¶ 14.)

Montgomery responds that her employer never provided her with any meaningful assistance. Montgomery then points out that the City provided another prosecutor, Jeff Gilliam, with workload assistance. In her deposition Montgomery stated that the Law Department helped Gilliam by providing an attorney to cover his

28

court from 1:30 to 4:00.  However, the court agrees with the City

that Gilliam is not an appropriate comparator.  The City points out

that Gilliam was hired under a special arrangement because he is a

divinity student. As Pate states, Gilliam specifically accepted

employment subject to the condition that he would begin work late

in the afternoon after his classes ended.  (Pate Affidavit ¶ 15.)

Thus, Gilliam is not similarly situated to Montgomery in all

relevant respects and therefore is not an appropriate comparator.

Because Montgomery has produced no other evidence from which a

reasonable jury could conclude that the Law Department acted with

a retaliatory motive, her retaliation claim as it relates to

workload assistance fails.

### Principal Attorney position

In Montgomery's February 18, 1998, EEOC charge, she states:

"Charging Party applied for the position of principal attorney,

which allegedly was not filled.  Two males were subsequently hired

(January 1998) as senior attorneys and are being treated for all

intent and purpose as principal attorneys."  Apparently Montgomery

is alleging that defendants failed to promote her to the position

of Principal Attorney in retaliation for her filing the previous

EEOC charges.  Assuming that Montgomery could establish her *prima*

*facie* case for retaliation, her claim fails because twelve other individuals in the Law Department, including men and Caucasians who had not filed EEOC charges, were also not selected for the positions. As the Eleventh Circuit has noted, a business decision that affects equally those inside of <u>and</u> outside of the protected class at issue is generally not discriminatory. <u>See</u> <u>Brown v. American Honda Motor Co., Inc.</u>, 939 F.2d 946, 952 (11th Cir. 1991) (citing <u>Giles v. Ireland</u>, 742 F.2d 1366, 1375-76 (11th Cir. 1984)). Put simply, the Law Department's decision to hire Love and Hughes adversely affected <u>everyone</u> who had applied for the Principal Attorney position, not just Montgomery.  Therefore, Montgomery cannot show that the Department's hiring of Love and Hughes was retaliatory against her.

Alternatively, Montgomery appears to allege a straightforward failure to promote claim based on discriminatory animus on account of sex.  <u>See</u> <u>Pl.'s E.E.O.C. Charge of 2/18/98</u>, at 1.  However, the same reasoning above which precludes a finding of retaliatory animus precludes a finding of discriminatory animus since men and Caucasians were also not selected for the positions.  Therefore, Montgomery's retaliation claim as to the Principal Attorney

30

position cannot succeed.[9]

### Drug house ordinance

Montgomery complains that the Law Department retaliated against her when Pate and Newton failed to give her any instructions regarding a drug house ordinance that she was assigned to draft. She further complains that when Newton finally responded to her inquiries regarding instructions, he told her that he needed the draft within one week; Montgomery says that this was not enough time for her to complete the draft.

The court first notes that nothing about the drug ordinance was mentioned or articulated in particular or in general in any of Montgomery's EEOC charges. Nevertheless, the court will address the issue only to point out that Montgomery has not shown that she suffered any adverse employment action in relation to the drug ordinance. Montgomery admits that she did in fact complete the assignment and that she never received any criticism regarding the matter. Thus, even assuming that something in the language of her EEOC charges encompassed this situation, Montgomery's retaliation

---

[9] Defendant addresses separately Montgomery's contention that the Law Department treated Senior Attorneys Love and Hughes like Principal Attorneys in retaliation against her. The court does not see how this is a separate claim from the one just analyzed, and the court can find nothing in Montgomery's EEOC charges, complaint, or brief to suggest that this is a separate claim.

31

claim fails.

### Alarm ordinance

Montgomery claims that the Law Department retaliated against her in March of 1998 when Principal Attorney Rowena Teague refused to give her extra time to complete an alarm ordinance which she had been assigned to draft. Montgomery had written a memo to Teague explaining that her heavy case load in traffic court had prevented her from completing the ordinance. As with the above drug house ordinance issue, the court will address Montgomery's complaint only for the purpose of pointing out that Teague's refusal to extend the due date for the ordinance is not an adverse employment action. Montgomery presented no evidence suggesting that her employment was, in any way, adversely affected by Teague's action. As Montgomery admits in her deposition, Teague continued to give her other assignments. Thus, Montgomery has no viable retaliation claim as it relates to the alarm ordinance.[10]

---

[10] In its brief in support of its motion for summary judgment, the City addresses as a separate claim plaintiff's statement in her deposition that the Law Department retaliated against her when it designated her as an individual it "would not recommend for rehire." (Def.'s Brief in Support of its Motion for Summ. J. at 47.) However, the court must not address a statement made in a deposition as if it were a claim properly pled.

32

## Section 1981 and Section 1983 Discrimination Claims

SECTION 1983

The court agrees with the Fifth Circuit that allegations of disparate treatment in connection with a Title VII claim cannot form the basis of a separate claim under § 1983. See Jackson v. City of Atlanta, Texas, 73 F.3d 60, 63 (5th Cir. 1996). This is so because § 1983 does not create substantive rights; instead, it merely creates a remedy for violations of substantive rights. Because Title VII provides the remedy for discrimination in employment on account of race or sex, alleging the same issue under § 1983 is redundant. Therefore, Montgomery's § 1983 claim based on disparate treatment must be dismissed.

SECTION 1981

Defendants argue that Montgomery cannot pursue her § 1981 claim because she is an at-will employee. There is no Eleventh Circuit precedent on this issue, and it would be a question of first impression in this court if it had to be decided. However, this court need not decide the issue because the test for intentional discrimination under § 1981 is the same as the formulation under Title VII discriminatory treatment cases, and thus, Montgomery cannot prove a violation of § 1981 for the same reasons set forth in the court's above analysis of her Title VII

33

claims.  See Brown v. American Honda Motor Co., Inc., 939 F.2d 946,
949 (11th Cir. 1991) (noting that the Supreme Court has held that
the test for intentional discrimination under § 1981 is the same as
the formulation under Title VII discriminatory treatment cases).

Even if Montgomery could show some kind of § 1981 violation,
the City's defense under Monell v. Department of Social Services of
New York, 436 U.S. 658, 98 S.Ct. 2018 (1978), is formidable.  Some,
if not all, of Montgomery's claims based on sexual harassment and
retaliation could have been processed through the Jefferson County
Personnel Board.  Whether the Personnel Board could have provided
Montgomery   with   "meaningful   administrative   review"   is   an
interesting academic question.  If it could, the Law Department/
City did not have "final policymaking authority."  This court in
Vincent v. City of Talladega, 980 F.Supp. 410 (N.D. Ala. 1997),
pointed out how the Eleventh Circuit has made it extra hard for an
alleged victim of a public employment related constitutional tort
to pursue a § 1981 or a § 1983 claim because most adverse actions
can be reviewed in some fashion by a personnel board.  Vincent at
417-418 (citing Scala v. City of Winter Park, 116 F.3d 1396 (11th
Cir. 1997)).  This court is glad it does not have to analyze the
"meaningfulness" of what the Jefferson County Personnel Board could
have provided in this case.

34

Also, even if there were a violation of § 1981, Pate and Newton are not liable because of their qualified immunity. In order to overcome the defense of qualified immunity, Montgomery must show that Pate and/or Newton violated clearly established law. See Busby v. City of Orlando, 931 F.2d 764, 773 (11th Cir. 1991). Specifically, Montgomery must come forward with a factually analogous case from the United States Supreme Court or from the Eleventh Circuit which establishes that a reasonable person in the Newton's or Pate's position would have known that the conduct complained of violated clearly established law. As this court has pointed out more than once before, the Eleventh Circuit test is stringent: "[O]nly plainly incompetent or lawless government officials will not be protected by qualified immunity." White v. Board of Trustees of The University of Alabama, 31 F.Supp.2d 953, 955 (N.D. Ala. 1999) (citing Harbert Intern., Inc. v. James, 157 F.3d 1271, 1285 (11th Cir. 1998).

Montgomery has not met this burden. She has not presented to this court any case law which would defeat the defense of qualified immunity as to her § 1981 claim. Therefore, even if the individual defendants discriminated against Montgomery, the doctrine of qualified immunity protects them.

**Section 1983 Procedural and Substantive Due Process Claims**

SUBSTANTIVE DUE PROCESS

It is not clear to the court what actions Montgomery contends to have denied her substantive due process rights. Regardless, Montgomery cannot pursue a substantive due process claim because public employment is not a life, liberty, or property interest that is protected by substantive due process. See McKinney v. Pate, 20 F.3d 1550, 1553, 1559-60 (11th Cir. 1994) (*en banc*) (discussing Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074 (1976) and Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487 (1985)).

PROCEDURAL DUE PROCESS

Next, Montgomery complains that she was deprived of procedural due process with regard to the Rice/Anthony incident. In order to succeed on her procedural due process claim, Montgomery must show: (1) defendants deprived her of a constitutionally protected interest in life, liberty, or property and (2) defendants did not provide her with the requisite procedural due process.

As to the first requirement, the only possible liberty interest that could be at issue here is the interest in one's reputation as it relates to the freedom to seek other employment. The Supreme Court has held that an employee can have a liberty interest in his reputation in the community; this includes the

36

liberty to be free from a stigma that would foreclose an employee's ability to pursue other employment opportunities.   See Board of Regents v. Roth, 408 U.S. 564, 573-574, 92 S.Ct. 2701, 2707 (1972). Applying this standard to the facts of this case, it is clear that Montgomery did not have a protected liberty interest.   As this court pointed out *supra*, the documentation surrounding the Rice/Anthony incident did not constitute adverse employment action. Montgomery was never reprimanded or accused of any wrongdoing by Pate or Newton.   Furthermore, even if the documentation could be construed as a reprimand, Montgomery's reputation in the community could not possibly have been damaged because the Law Department never revealed to the public or any potential employers the facts or documents relating to the Rice incident.   Indeed, Montgomery was employed within two weeks of resigning from the Law Department.   In sum, there is no evidence to suggest that this documentation placed any kind of stigma on Montgomery so as to preclude her from obtaining future employment.

Furthermore, even if Montgomery could somehow establish a life, liberty or property interest, she cannot meet the second requirement because she was given notice of Chief Johnson's allegations and the opportunity to respond fully, in detail, to those allegations.   Montgomery seized this opportunity and provided

37

Pate with a detailed memo which explained her version of events. Thus, the court cannot see how the Law Department deprived Montgomery of any procedural due process to which she might have been entitled.   Thus, Montgomery's § 1983 claim based on the deprivation of procedural due process fails as to the City and as to the individual defendants as well.[11]

### Section 1985(3) Conspiracy Claim

As is true with § 1983, § 1985(3) cannot be used to pursue claims of discrimination under Title VII.   See Great American Federal Savings & Loan Assoc. v. Novotny, 442 U.S. 366, 378, 99 S.Ct. 2345, 2352 (1979).  Because the facts and claims underlying Montgomery's Title VII action form the basis of her § 1985 claim, her claim under § 1985 must be dismissed as to the City and as to the individual defendants.

### Tort of Outrage Claim

As the Alabama Supreme Court has pointed out many times, the tort of outrage is "a very limited cause of action that is

---

[11] Montgomery mentions in her response to the City's motion for summary judgment that the City also violated the First Amendment under section § 1983. To the extent that Montgomery is attempting to add a § 1983 claim based on the First Amendment, it was not pleaded in her complaint and cannot be allowed. Conversely, to the extent that Montgomery is also alleging a violation of the Equal Protection clause, her claim fails because she failed to raise or make any arguments regarding any Equal Protection claim in her response brief.  As the Eleventh Circuit has pointed out, "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995).

38

available only in the most egregious circumstances." Thomas v. BSE Indus. Contractors, Inc., 624 So.2d 1041, 1044 (Ala. 1993). So far, the Alabama Supreme Court has found that a jury question exists in only three categories of cases: (1) those involving wrongful conduct with regard to family burials; (2) those involving heavy-handed tactics as used by insurance agents; and (3) those involving egregious sexual harassment. Montgomery's case obviously does not fall into categories (1) and (2), and this court explained *supra* that there is no evidence of sexually harassing behavior. Because there is no other evidence to suggest that defendants' alleged conduct was extreme and outrageous or that Montgomery suffered emotional distress so severe that no reasonable person could be expected to endure it, Montgomery's outrage claim cannot survive summary judgment. See American Road Service Co. v. Inmon, 394 So.2d 361 (Ala. 1981).

<u>CONCLUSION</u>

A separate and appropriate order will be entered.


DONE this _20ᵗ_ day of January, 2000.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

39